No. 14368

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

---

MONTANA-DAKOTA UTILITIES COMPANY
et al.,

Plaintiff and Respondent,

-vs-

LOWER YELLOWSTONE RURAL ELECTRIC et al.,

Defendants and Appellants.

---

Appeal from: District Court of the Seventh Judicial District,
Honorable L. C. Gulbrandson, Judge presiding.

Counsel of Record:

For Appellants:

V. G. Koch argued, Sidney, Montana
Habedank, Cumming and Best, Sidney, Montana
Otto T. Habedank argued, Sidney, Montana

For Respondent:

Cresap and Phillips, Sidney, Montana
Paul S. Cresap argued, Sidney, Montana

---

Submitted: July 21, 1978

Decided: SEP 2 1978

Filed: SEP 1978

Thomas J. Kearney
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

This appeal arises from a declaratory judgment entered in favor of Montana-Dakota Utilities Company by the District Court, Seventh Judicial District, Richland County, Montana. The principal issue is whether Lower Yellowstone Rural Electric Association, a cooperative, and Upper Missouri G and T, a cooperative, its electric supplier, have the right to tap an electric transmission line owned by Montana-Dakota Utilities Company (MDU) under an agreement between MDU and Basin Electric Power Cooperative.

Lower Yellowstone Rural Electric Association (LYREA) is a transmission and electrical distribution cooperative, serving its members in the area involved in this dispute. Upper Missouri G & T Electric Cooperative (UM G & T) is an electric generation and transmission cooperative of Sidney, Montana, which is the electric power supplier to 11 member cooperatives, including LYREA. UM G & T is in turn a member and part owner of Basin Electric Power Cooperative (Basin) which is an electrical generation cooperative organized for the purpose of generating and supplying the electric power needs of its members.

Shell Oil Company (Shell) is contemplating construction of a gas plant to be located in the SE 1/4 of Section 7, Township 22 North, Range 60 East, Richland County, Montana. The electric needs of the proposed Shell gas plant are such that the estimated connected load for full plant operation at its industrial plant will be 400 kilowatts or larger within 2 years from the date of initial service. The electric service load is needed both for the plant when it is in full operation, and for construction of the plant.

Montana-Dakota Utilities Company is an electric utility engaged in generating, transmitting and supplying electric power.

The proposed Shell plant is within the service area both for MDU and LYREA; since UM G & T is the electrical supplier for LYREA, it is also included in the case as a defendant. There is no dispute that defendants are proper parties before us nor any objection that Basin has not been made a party defendant in this cause.

On January 13, 1972, MDU and Basin entered into an Interconnection and Common Use Agreement ("agreement") for joint use of their electrical facilities, where capacity allowed, in order to "maximize service reliability and minimize the respective investments". The electric power needs of UM G & T and its members are obtained from Basin and the United States Bureau of Reclamation (Bureau). MDU and UM G & T are suppliers of the total requirements for electric power used by consumers within their respective service areas. Even before the agreement of January 13, 1972, the Bureau wheeled electric power over the transmission lines of MDU for the use of UM G & T and its members, for which the Bureau paid MDU sums based on tabulations of kilowatt hours delivered to the cooperative members.

The nearest transmission line to the proposed Shell gas plant is a 57 kilo-volt (KV) transmission line owned by MDU but subject to the agreement. The point to be decided here is whether MDU or LYREA will be the electric supplier for the proposed Shell gas plant. Resolution of that question requires an examination of the Electric Suppliers Territorial Integrity Act, section 70-501 et seq., R.C.M. 1947, and the terms of the agreement.

-3-

In determining the meaning of the statutes, it is well to keep in mind the definitions provided by section 70-502, R.C.M. 1947:

"(1) The term 'electric supplier' means any electrical utility and any electric co-operative.

"(2) The term 'electric utility' means a person, firm, or corporation other than an electric co-operative which furnishes electrical service to the public.

"(3) The term 'electric co-operative' means a rural electric co-operative organized under Chapter 5 of Title 14, or a foreign corporation admitted to do business in Montana.

" . . .

"(5) The term 'line' means any electric conductor operating at a nominal voltage level of sixty-nine thousand (69,000) volts or less, measured phase-to-phase."

With respect to a new industrial electric customer in a rural area, such as the proposed Shell gas plant, the following pertinent portions of section 70-503, R.C.M. 1947, apply:

"(2)(a) Subject to subsection (3) the electric supplier having a line nearest the premises, as measured in accordance with subsection (2) (b), shall serve premises initially requiring service after the effective date of this act.

"(b) All measurements under this act shall be made on the shortest straight line which can be drawn from the conductor nearest the premises to the nearest permanent portion of the premises. Construction power for premises to be constructed shall be supplied by the electric supplier having the right to serve the completed premises.

"(3) An electric utility shall have the right to furnish electric service to any industrial or commercial premises if the estimated connected load for full plant operation at such industrial or commercial premises will be 400 kilowatts or larger within two (2) years from the date of initial service, provided however such electric utility can extend its lines to such industrial or commercial premises at less cost to the electric utility, or the industrial or commercial customer, than the electric co-operative cost. . . . No premises other than another such commercial or industrial premises shall be served from a line constructed under this section . . . ."

-4-

It appears from the record if MDU extends a line from its 57 KV transmission line to the proposed customer, its cost will be less than if LYREA utilized its nearest conductor to extend such a line, because the Richland conductor is 2.63 miles further away from the proposed customer; however, if LYREA has the right to tap the MDU 57 KV transmission line under the agreement, then LYREA'S cost of extending such line to the proposed customer would be the same as that of the electric utility, and under section 70-503(3), R.C.M. 1947, previously quoted, LYREA would then have the right to supply the customer by tapping MDU's transmission line. It also appears if MDU has the right under the agreement to refuse permission to LYREA to tap its transmission lines to serve Shell, then MDU will be the electric supplier for that proposed load; whereas, if under the agreement LYREA has the right to tap the transmission line, then under the statute LYREA will be the electric supplier for that load.

The District Court made the following Findings of Fact and Conclusions of Law which are pertinent here:

Finding of Fact No. 6:

"6. That according to the terms of such agreement, Montana-Dakota Utilities Company has the sole right to determine excess capacity and permissible use of their 57 KV line other than at those points of delivery and the entitlement amounts set forth in the supplements to the interconnecting and common use agreement."

Finding of Fact No. 7:

"7. That the Lower Yellowstone Rural Electric Association has no right to tap into the 57 KV line owned by Montana-Dakota Utilities Company as the point where Montana-Dakota Utilities measures from to determine distance to the proposed gas plant, without permission from Montana-Dakota Utilities, which permission has been denied."

Finding of Fact No. 8:

"8. That the evidence as to other loads being serviced, or needs for the future, although heard by the Court for purposes of completeness of the record, is irrelevant in this matter and therefore inadmissible."

-5-

Finding of Fact No. 9:

"9. That the term 'costs' as used in the statute refers to cost of construction from the starting point to the industrial load, without allocation to other consumers."

Finding of Fact No. 10:

"10. That the Montana-Dakota Utilities 57 KV line is approximately 13,900 feet closer than the Lower Yellowstone Rural Electric Association's nearest source."

Finding of Fact No. 11:

"11. That the cost of construction from Montana-Dakota Utilities 57 KV line will be less than the cost of construction for Lower Yellowstone Rural Electric Association from their nearest source."

Finding of Fact No. 12:

"12. The Court further finds that the interpretation placed upon Exhibit 'A' by the defendants would preclude Montana-Dakota Utilities from all industrial loads within the geographic area covered by said Exhibit 'A'. The Court is unable, after careful consideration of said agreement, to determine any intent of any party thereto, that Montana-Dakota Utilities should surrender its statutory rights under Section 70-503 R.C.M., 1947, which predated the execution of said agreement."

It also found as a Conclusion of Law:

"2. That Montana-Dakota Utilities Company has the right to furnish electrical power to the proposed Shell Oil Company gas plant, together with the right to furnish electrical power for construction of such plant."

Our first consideration in determining the issues in this case is to look to the Electric Suppliers Territorial Integrity Act, to determine if a statutory grant or priority may be found for either supplier in this case. Essentially, this requires an examination of the provisions of section 70-503. Under section 70-503(2)(a), the electric supplier, be it cooperative or utility, having lines nearest the premises, shall serve the premises initially requiring service after the effective date of the act (July 1, 1971). The closest supplier is determined under (2)(b) of that section by the shortest line which can be drawn from the conductor nearest

the premises to the nearest permanent portion of the premises. Since MDU's 57 KV line is the "conductor" nearest the Shell plant MDU has the statutory priority, provided it meets the provisions of section 70-503(3). Section 70-503(3) gives an electric utility the right to furnish electric service to an industrial customer on two conditions: (1) that the estimated connected load for the proposed customer will be 400 kilowatts or larger within two years from the beginning of service; and (2) that the utility can extend its lines to such industrial customer at less cost to the electric utility or the customer, than the electric cooperative cost. Again, MDU meets each of these conditions, there being no dispute as to the estimated connected load after service begins and it appearing that MDU's 57 KV line is nearer the customer by some 2.63 miles than the nearest conductor of the electric cooperative.

Therefore, under the Electric Suppliers Territorial Integrity Act, MDU has the clear right to serve Shell's proposed gas plant, subject to one possibility which we must next determine.

That possibility is whether under the agreement, LYREA and its supplier UM G & T have the contractual right to tap the 57 KV line owned by MDU in order to supply Shell. If LYREA has that contractual right, then its cost of construction of the line would be the same as the cost to MDU, in which event, under section 70-503(3), the cooperative would gain the statutory right to serve Shell. Under this section, the utility does not have a statutory right unless its cost for construction of line is less than the cost would be for the electric cooperative.

The agreement therefore becomes the principal source of contention in this case, and we must look to the agreement to determine the issues here involved.

-7-

The appellants, LYREA and UM G & T contend as follows:

1. The agreement was more than a one-time contract to service delivery points listed therein and was in fact a continuing agreement to interconnect and jointly use all systems in the future.

2. It was intended by the parties that their entire systems under the agreement be subject to interconnection and common use, and future facilities be constructed as provided by Article 2-A of the agreement and future investments shared as set forth in Article 2-B of the agreement.

3. If District Court Finding No. 6 is upheld, the contract has no force of meaning since the owner of the system could determine there was no excess capacity regardless of facts. The whole intent of the agreement would be destroyed, since then a party could arbitrarily deny any connection with and common use of its system.

MDU on the other hand contends:

1. The contract provided that parties must mutually agree with respect to additional transmission, substation and related facilities to increase services to respective parties from the interconnected system beyond what is already agreed.

2. The existence of excess capacity is a matter to be determined solely by the owner of the line.

3. The true intent of the agreement was that for future expansion and interconnection, the parties to the agreement must mutually agree by supplementing the contract as to point of delivery and amount of delivery.

In interpreting contracts, our guideposts are the statutes enacted by legislature, and a large body of case law. In short, a contract is to be construed so as to make it definite, operative and reasonable (section 13-709, R.C.M. 1947); words

-8-

are to be understood in their usual sense (section 13-710, R.C.M. 1947); and technical words are interpreted in the sense used in business to which they relate (section 13-711, R.C.M. 1947). However broadly the contract may be stated, it extends only to those things the parties intended to provide for (section 13-714, R.C.M. 1947) and repugnancies must be reconciled if possible to give some effect to the repugnant clauses, subordinate to the general intent of the parties and the purpose of the contract (section 13-718, R.C.M. 1947).

We may also look to how the parties themselves have construed the contract in the past performance of it. Knapp v. Andrus (1919), 56 Mont. 37, 180 P. 908; Rentfro v. Dettwiler (1933), 95 Mont. 391, 26 P.2d 992; Brown v. Griffin (1968), 150 Mont. 498, 436 P.2d 695; State ex rel. Yellowstone Park Company v. District Court Fourth Judicial District (1972), 160 Mont. 262, 502 P.2d 23.

We conclude the District Court was correct in its decision in this case, after we have examined the contractual provisions, and the way the parties have construed the agreement between themselves.

The pertinent provisions of the agreement are these:

### "ARTICLE 1

"A. Facilities agreed to be constructed by the parties shall be listed in supplements to this contract. Each supplement shall describe the facilities to be added by each party, the estimated cost, and the in service date of each facility. . .

"B. Additional division and installation of facilities and other methods of mutually beneficial operation may be developed from time to time, and this Agreement may be amended by Supplements and Attachments from time to time agreed upon and executed by both parties hereto, and the entire agreement between the parties hereto shall consist of this Agreement and such Supplement or Supplements, Attachment or Attachments as may from time to time be executed by the parties hereto."

-9-

## "ARTICLE II

"A.   This Contract provides for facilities to
deliver bulk electric service to existing and
future delivery points as determined to be
needed by estimates of increase in electric
service requirements in excess of requirement
levels existing as of the December, 1971 billing
period.   It is recognized that in the future,
additional electrical transmission, substation
and related facilities will be necessary for
mutual benefit of the Company, and the Coopera-
tive and its Members collectively, in the
operation of the interconnected facilities of
the parties hereto.   The parties shall, not less
often than biennially, review electric service
requirements as experienced and as contemplated
to be required within the following five years,
and mutually agree upon the time within which
the additional transmission, substation and
related facilities shall be placed in service
by the respective parties . . .

". . .

## "ARTICLE IV

"A.   The Points of Delivery and Capacity Amounts
which the Parties are entitled to have delivered
as a result of their respective investments in
accordance with the provisions of Article II
shall be tabulated and identified in an Exhibit
included as part of each Supplement executed on
behalf of each of the Parties and attached to
this Agreement.   Such Exhibit may be amended from
time to time as the parties may agree, to add to
or subtract from or change quantities of the Points
of Delivery. . .

"B.   To the extent that the transmission system is
capable of delivering electric service in excess
of the quantities set forth in said Exhibit to
each Supplement, in the sole determination of
the owner, either party may use such excess capacity,
so long as such excess shall exist, including the
right to tap the transmission lines of the other
party, within the common service area as shown on
the map, attached hereto as Exhibit A in accordance
with Article VI-J of this Agreement. . ."

We interpret the foregoing provisions of the agreement

that the purpose of the contract is to provide for facilities

to deliver <u>bulk</u> electric service to existing and future

delivery points (Article II(a)).

The facilities to be used jointly by parties were to be

listed in supplements added to the contract (Article I(A)).

-10-

The addition of future facilities or methods of mutually
beneficial operations were to be provided by supplements and
attachments, but these were to be agreed upon and executed
by both parties (Article I(B)). The point of delivery and
the capacity amounts which the parties are entitled to have
delivered to them are required to be tabulated and identified
in an exhibit included as part of the supplement attached
to the agreement. The exhibit regarding delivery points
could also be amended from time to time, again subject to
the agreement of both parties (Article IV(a)).

The nub of the cooperative's argument that it is entitled
to tap transmission lines of MDU to serve the Shell gas
plant lies in the language of Article IV(B). It is provided
elsewhere in the agreement that all property owned by either
party subject to the agreement shall remain the property of
that party no matter where situated and by whom installed or
operated. Thus MDU is the owner of the 57 KV transmission
line, even though it is a transmission line subject to the
terms of the agreement. LYREA maintains here the clause,
"in the sole determination of the owner," modifies the
clause preceeding it, rather than the clause succeeding it.
This troublesome clause is in such juxtaposition that some
ambiguity results. LYREA maintains the clause modifies the
preceeding language, so that it is "in the sole determination
of the owner," to determine the excess that the transmission
system is capable of delivering over and above the quantities
set forth in the exhibits. From that interpretation, LYREA
argues to consider MDU the sole determiner of excess capacity
in the 57 KV transmission line would be to deprive the contract
of force or meaning since the owner could determine there was
no excess capacity regardless of the fact excess capacity might

-11-

indeed be present. While we admit the language used is subject to that possible interpretation, yet we conclude it is more consistent with the purpose and general intent of the contract, the clause "in the sole determination of the owner" modifies the succeeding language, namely, either party may use the excess capacity as long as it exists, including the right to tap the transmission line of the other party, but only in the sole determination of the owner. In other words, we find the intent and purpose of the agreement between the parties is to provide that their facilities which are subject to the joint interconnection agreement are to be used for points of delivery and for amounts of entitlement as set forth in exhibits attached to the agreement. To the extent there is excess capacity in the joint transmission systems over and above the entitlement rates at the points of delivery, that excess capacity may be used by either party, but in the sole determination of the owner of the facility involved.

Were we to hold otherwise, it would mean anytime excess capacity existed, either party could, without the consent of the owner, tap the transmission lines of the other for the purpose of enlarging its entitlement in the system or for serving new loads such as the new Shell gas plant. It was this possibility that led the District Court to its finding of fact No. 12, above quoted, to the effect MDU would be precluded by such an interpretation from serving all new industrial loads within the geographic area covered by the agreement. The District Court determined this would in effect deprive MDU of its statutory rights under the Electric Suppliers Territorial Integrity Act, because under this agreement, as so interpreted, the cooperative, having the right to tap the

-12-

transmission lines of MDU would in all cases be the electric supplier for new industrial loads. This, being because in such cases there would never be a situation in which MDU's cost of extending its line to the new load would be less than the cost of the cooperative, as required by section 70-503(3), R.C.M. 1947.

We are fortified in our construction of the contract by the way the parties themselves have construed this agreement. On the same date as the execution of the agreement, the parties entered into two supplements for interconnection and common use of their joint facilities. Supplement No. 1 covers the area in which the Shell gas plant would be located. In Exhibit No. 1-B to Supplement no. 1, as required in Article IV, Paragraph A, above quoted, there is set forth for the company and for the cooperative, the points of delivery and entitlement rates of delivery throughout the geographic areas. Supplement No. 1 is dated and executed in formal manner as is the agreement itself. The attachment of those supplements makes it clear the parties intended from the beginning that all points of delivery from the inter-connected system would be specifically designated in supplements which were to be agreed upon by the parties. Thus, unless MDU agrees, LYREA has no contractual right to tap MDU's 57 KV transmission line. Of course, the same rule of consent from the owner would apply if MDU wanted to tap any of the cooperative's transmission lines also subject to the agreement.

This Court finds itself in agreement therefore with the interpretation of the agreement by the District Court, and with its conclusion that M U has the statutory and contractual right to be the electric supplier for the proposed Shell gas plant.

-13-

One other contention of LYREA however, should be mentioned. The cooperative contended if it were allowed to tap the MDU transmission line, it could serve not only the Shell gas plant, but also several other electric users in the vicinity including, for example, some oil well pumping units. The cooperative contended the possibility that other consumers might also use the same service line would reduce the cost of the service line to the cooperative, because it could allocate such costs to the different potential users. The cooperative contended this fact should be considered in determining which electric supplier has the lesser cost in supplying the Shell gas plant. However, section 70-503(3), R.C.M. 1947, is clear such allocation could not be considered by the Court. The statute provides "no premises other than another such commercial or industrial premises shall be served from a line constructed under this section". Unless therefore the other potential users met the qualifications for commercial and industrial premises, (a load of 400 kilowatts or larger) they could not be served from such a new service line, where the electric supplier is determined under section 70-503. Moreover, if such potential additional new users existed, MDU would have as much right to serve them as would the cooperative, thus making the cost to each the same, in which event the ownership of the nearest conductor would determine the electric supplier.

The declaratory judgment of the District Court is affirmed.

John C. Sheehy
                                    Justice

-14-

We Concur:

_Frank I. Haswell_
Chief Justice

_____

_John Conway Harrison_
Justices

_Robert J. Boyd_
Hon. Robert J. Boyd,
District Court Judge,
Sitting in for Mr. Justice
Gene B. Daly

-15-